IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

| | |
|---|---|
| **FREDERICK L BOYD,** | ) |
| | ) |
|     **Plaintiff,** | ) |
| | ) |
| v. | ) Case No.: 1:14-CV-1110-VEH |
| | ) |
| **FREDERICK MONTEZ BOYD,** | ) |
| | ) |
|     **Defendant.** | ) |
| | ) |

## MEMORANDUM OPINION AND ORDER

**I.    Stipulated Facts**[1]

1.    This case began as an interpleader action by Prudential Insurance Company of North America. (Tr. 3:13–16).

2.    Cormella Boyd had a life insurance policy through prudential's group insurance plan for Walmart. (Tr. 3:15–16). Cormella Boyd was covered for $37,000 basic life insurance, $200,000 optional term life insurance, tr. 3:18–21, and $200,000 accidental death and dismemberment insurance. (Tr. 4:14–17). Frederick L Boyd was designated as the primary beneficiary under these policies,

---

[1] Section I's Stipulated Facts are documented as stipulated by the parties in the hearing of February 17, 2016. These facts, as well as the following Findings of Fact, Section II *infra*, include citations to a draft transcript of the hearing as appropriate. Section II also contains the court's inferences from the facts presented at the hearing.

tr. 4:24, Frederick Montez Boyd is the alternate beneficiary. (Tr. 5:2–4).

      3.      Frederick Montez Boyd is her son, and Montez Boyd is her husband. (Tr. 3:16–17). Frederick Montez Boyd is commonly referred to as Montez Boyd; the father is commonly known as Frederick Boyd. (Tr. 2:4–6).

      4.      On July 23, 2012, Cormella Boyd died from multiple gunshot wounds. (Tr. 5:3–4). Frederick Boyd is Carmella Boyd's killer. (Tr. 6:3–10).

      5.      Frederick Boyd has been charged with her murder. (Tr. 5:4–5.4:2). Frederick Boyd's trial is pending in Calhoun County Circuit Court. (Tr. 5:5–6).

      6.      Frederick Boyd was first evaluated for mental capacity approximately eight months after the shooting, and the examiner determined that his capacity was not too diminished to proceed. (Tr. 9:21–24). In June 2014, he was found to be extremely paranoid and psychotic, and the examiner recommended inpatient treatment and evaluation. (Tr. 9:24–10:3). Frederick Boyd was found incompetent to stand trial on October 2, 2014, and he was committed to Taylor Hardin Secure Medical Facility until such time as he could be restored to competence. (Tr. 5:9–12).

      7.      Prudential paid $548,556.14, inclusive of interest, after Cormella Boyd's death into the office of the clerk for the United States District Court for the Northern District of Alabama. (Tr. 5:12–17). Thereafter, Prudential was dismissed

from the case, and the parties were realigned. (Tr. 5:17–20).

   8.   Montez Boyd filed a motion to approve distribution of the funds to him, alleging that Frederick Boyd is precluded from receiving any payment of this money due to Frederick's Boyd's role as Cormella Boyd's killer. (Tr. 5:23–6:2).

   9.   Frederick Boyd's current custodians decline to give an opinion of his mental state at the time of Cormella's killing until his faculties have returned. (Tr. 12:8–13).

## II.   Findings of Fact

   1.   The night of July 22, 2012, Cormella and Frederick Boyd had an argument. (Tr. 53:16–23). Cormella Boyd was "intense," but Frederick Boyd was quiet. (Tr. 54:9–13). Frederick brought up an "Uncle Milton" during the argument, but Cormella told Frederick to drop the issue. (Tr. 66:19–24).

   2.   Frederick Boyd rose and left for work as usual the following morning, July 23, 2012. (Tr. 56:11–16). Driving Cormella's Mitsubishi Galant, Frederick went to work briefly at the Anniston Police Department before returning home. (Tr. 80:2–24).

   3.   When he got home, Frederick knocked on the door. (*See* tr. 57:1–2). Cormella, who had been asleep, went downstairs and answered the door. (Tr. 57:2–3). Frederick walked in, and he and Cormella went upstairs. (*See* tr. 57:3–6).

4. Frederick pointed a gun at Cormella, who screamed as Frederick shot her eight times. (*See* tr. 58:2–3; 45:22–25). Frederick then ran down the stairs, slammed the front door, cranked his GMC Yukon, and drove away. (*See* tr. 58:3–7; 80:25–81:4).

5. Montez Boyd had been in his room when Frederick arrived, and that is where he remained until after the shooting. (Tr. 57:1–59:8). Once he heard Frederick leave, Montez called 911, and the dispatcher instructed him to stay on the line and in his room. (Tr. 58:7–10). While waiting on the police to arrive, Montez heard heavy breathing outside of his room, like an animal or someone gasping for breath. (Tr. 60:9–16). Eventually, a police officer arrived, and he spoke to Montez through the latter's bedroom window so that Montez could relay what had happened to the officer. (Tr. 59:2–7). The officer directed Montez to come downstairs and open the door. (Tr. 59:7–8).

6. Upon exiting his room, Montez found his mother, Cormella, in a pool of her own blood in front of his door. (Tr. 59:22–23). She had several gunshot wounds, was not breathing, and her eyes were dead. (Tr. 59:23–60:2). He stepped over her body, tr. 60:5–8, and went downstairs to open the door for the officer. (Tr. 60:2–4). She would later be pronounced dead at the scene. (Tr. 29:20–21).

7. Meanwhile, Frederick proceeded to the home of Milton Rowe, a

4

relative, who he believed to have been having an affair with Cormella. (Tr. 81:8–82:7). The trip took about 15 minutes, and when he arrived, Frederick shot Milton. (*See* tr. 79:5–21). Concern about Cormella's perceived infidelity motivated the shootings. (Tr. 82:8–11).

8. From Rowe's home, Frederick drove to Meridian, Mississippi. (Tr. 82:24–83:16; 89:6). He then turned himself in to the officials in Mississippi, telling them that he had shot his wife and his uncle. (Tr. 83:17–84:1).

9. Frederick informed the Mississippi police that he began to have memories of his wife having been part of a plot to kill him. (Tr. 88:14–16). He claimed to have confronted her about it the night before, and she responded "Huh," which angered him. (Tr. 88:17–18). Frederick claimed that there had previously been three people he could trust, but he could no longer trust them. (Tr. 88:18–19). He stated that "I'm a dead man when I go back to Alabama. I just wanted the Feds to know what was going on over there," and he spoke of corruption within the Anniston Police Department. (Tr. 88:21–89:2).

10. The next time Montez saw his father, at a later date in 2012, he visited him in jail. The two discussed Montez's shooting ability, and Frederick both recognized Montez and had a working memory of Frederick's instruction to Montez about how to shoot. (Tr. 61:4–62:25). Frederick apologized for what he

did. (Tr. 63:12).

11.     Murder is a felony in Alabama. (85:13–17).

12.     When questioned by police during the investigation of Cormella's death, Montez informed them that Frederick had cancer when Montez was young, and it traumatized Frederick. (Tr. 66:11–12). Frederick had said to Montez that his memory was coming back, and that Frederick's Uncle Milton had something to do with Frederick's perceived mistreatment at the hands of the Anniston Police Department. (Tr. 66:13–17).

13.     George Teague, Cormella Boyd's father, informed the police that Frederick had been acting strange lately and that he did not like to talk on the phone. In particular, Frederick would often remove the battery from his phone for fear of global positioning. Teague was unaware of any jealousy between Cormella and Frederick. (Tr. 86:12–20).

14.     While in custody, Frederick refused to speak with the local authorities about Milton Rowe and would only speak with the FBI. (Tr. 90:2–13). He also refused to be interviewed in the Calhoun County jail (he was ultimately interviewed in Etowah County), and when he spoke with the FBI, he informed them that he had been kidnapped by Uncle Milton and escaped with a knife. (Tr. 91:8–15). He claimed to have been arrested and placed in Calhoun County jail

where he was drugged by three deputies, although the charges were later dropped. (Tr. 91:16–19). There is no record of such an arrest. (Tr. 91:19–20). He informed them that he had sexual contact with numerous people while in school, including Anniston police officers. (Tr. 92:4–9). The investigating officers could not verify this information. (Tr. 97:3). Frederick also said he believed his wife was poisoning him. (Tr. 98:19–21).

15.    Montez summarized all this during the February 17, 2016, hearing by stating that his father had been behaving strangely for a few weeks before the shooting. (Tr. 68:3–10).

### III.   Discussion

Alabama's slayer statute, ALA. CODE § 43-8-253, is a codification of the equitable maxim that a person should not profit from his wrongdoing. *See Weaver v. Hollis*, 22 So.2d 525, 528–29 (Ala. 1945). Relevant here, section 43-8-253(c) provides that "[a] named beneficiary of a . . . life insurance policy . . . who feloniously and intentionally kills . . . the person upon whose life the policy is issued is not entitled to any benefit under the . . . policy . . . and it becomes payable as though the killer had predeceased the decedent." "In the absence of a conviction of felonious and intentional killing the court may determine by a preponderance of evidence whether the killing was felonious and intentional for purposes of this

section." ALA. CODE § 43-8-253(e).

The criminal code of Alabama and section 43-8-253 are *in pari materia*, so the court turns to the criminal code to determine the meaning of "intentional and felonious." "A person acts intentionally with respect to a result or to conduct described by a statute defining an offense, when his purpose is to cause that result or engage in that conduct." ALA. CODE § 13A-2-2(1). A felony is "[a]n offense for which a sentence to a term of imprisonment in excess of one year is authorized." ALA. CODE § 13A-1-2(8). Thus, the conduct must be intentional; it must constitute a crime for which imprisonment in excess of one year is authorized; and, since a killing is required, it must be a homicide.

The qualifying crimes under Alabama law are murder under section 13A-6-2(a)(1) ("intentional murder") and manslaughter under section 13A-6-3(a)(2) ("voluntary manslaughter"). A person is only liable for voluntary manslaughter when the elements of a greater form of homicide are satisfied but the person is found less culpable by operation of section 13A-6-3(b) because the killing was committed in the heat of passion. The crimes that may be reduced to voluntary manslaughter are intentional murder under section 13A-6-2(a)(1) and extreme indifference murder under 13A-6-2(a)(2); the latter of which requires a mental state of recklessness. Since there is no free-standing mental state for voluntary

manslaughter, satisfaction of the slayer statute can only be determined by reference to the mental states found in sections 13A-6-3(a)(1)–(2). The upshot here is that a civil court may operationalize its analysis of the slayer statute's application by considering first, whether the purported slayer has committed intentional murder, and, if so, second, whether he or she did so in the heat of passion. The End.

This analytical framework is supported by the dispositive status assigned to a conviction for a felonious and intentional killing for purposes of the slayer statute's application, *see* ALA. CODE § 43-8-253(e), and that section's comments suggesting that the slayer statute's application in the absence of a criminal conviction is reflective of the lower burden of proof in a civil case and "the different considerations" of the slayer statute; *e.g.*, that there can be no criminal prosecution for a murder-suicide, but the slayer statute's "punishment" may still be applicable. ALA. CODE § 43-8-253 comment. Thus, the substantive conduct covered by the slayer statute and intentional murder/voluntary manslaughter is the same; it is the burden of proof and reach of the statute that varies.

Intentional murder occurs when a person "[w]ith intent to cause the death of another person . . . causes the death of that person," ALA. CODE § 13A-6-2(a)(1). I find, by a preponderance of the evidence before me, that Frederick intentionally murdered Cormella. It is undisputed that Frederick caused Cormella's death. There

is strong evidence of his <u>intent</u> to cause her death, as well. Frederick shot her eight times, which would be an unlikely occurrence if the shooting had not been intentional. He switched vehicles from Cormellas's Galant to his Yukon after shooting her, which would also be a strange thing to do had he not planned to murder Cormella and then Milton. His flight from Alabama also demonstrates that his actions were part of a scheme that he concocted. Further, the evidence reflects that Frederick's reason for killing Cormella is the rumor of an affair. Finally, he drove to Mississippi, turned himself in, and admitted killing Cormella. Since Frederick intended to cause Cormella's death and actually did so, he killed her feloniously and intentionally. The slayer statute, ALA. CODE § 43-8-253(c), is satisfied.

    Frederick's incompetence to stand trial raises the specter of another issue, which is whether the insanity defense to criminal liability also applies as a defense to the application of the slayer statute. *Compare Estate of Armstrong v. Armstrong*, 170 So. 3d 510 (Miss. 2015) (Yes!), *with Osman v. Osman*, 737 S.E.2d 876 (Va. 2013) (No!). It is an open question in Alabama, *see Ford v. Ford*, 512 A.2d 389, 401 (Md. 1986)[2] (surveying the states on the issue), but it is also one that the court need not take up. Aside from some testimony by Montez indicating that his father

---

[2] It does not appear Alabama has reached the issue in the thirty years since *Ford*.

had been acting strangely, the only <u>evidence</u> before me of Frederick's unusual behavior <u>at or before the time of the murder</u> was a statement by George Teague that Frederick disliked using cell phones and would remove his phone battery. This falls far short of demonstrating that Frederick's "mind is so diseased that either he cannot distinguish between right and wrong as to the particular offense in question or he cannot resist an impulse to commit such offense if solely produced by his mental disease." *Johnson v. State*, 319 So. 2d 725, 727 (Ala. Crim. App. 1975). Accordingly, this issue of state law need not be resolved.

## IV. Conclusion

For the foregoing reasons, Frederick L. Boyd cannot benefit from Cormella Boyd. The proceeds from Cormella's life insurance policy, $548,556.14, plus interest, are therefore to be distributed to Frederick Montez Boyd, the alternate beneficiary under Cormella Boyd's life insurance policy.

## V. Distribution

Upon application by Frederick Montez Boyd to the Clerk of Court for distribution of the funds interpleaded in this case, the Clerk of Court is **DIRECTED** to make such distribution. Provided, however, that no such distribution shall occur before the time to file a notice of appeal of this order has expired without such notice having been filed.

**DONE** and **ORDERED** this 2nd day of March, 2016.

                                                        */s/ Virginia Emerson Hopkins*
                                                       **VIRGINIA EMERSON HOPKINS**
                                                       United States District Judge